# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO.  3:24-CR-00189-01** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LARRY MITCHELL (01)** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress [doc. #19] filed by Defendant Larry Mitchell.  The motion is opposed.  [doc. #26]. For the reasons stated below, **IT IS RECOMMENDED** that the motion be **DENIED**.

## Background

As part of a state case unrelated to the current matter, Defendant Larry Mitchell ("Mitchell") was ordered to obtain a GPS ankle monitor as a condition of his bail.  (Memo in Support of M/Suppress [doc. #19-2, p. 1]).  Mitchell was required to contact an approved company to install the ankle monitor and provide monitoring services.  *Id.*  The state court order specifically stated that the sole purpose of the GPS ankle monitor was to ensure that Mitchell did not go within 1,000 feet of the residence of the victim.  *Id.*  If Mitchell entered the 1,000 feet perimeter, the appropriate authorities would be notified by the monitoring company.  *Id.*

Mitchell signed a monitoring agreement, which provides as follows:  "[i]f you are being monitored by a GPS device as part of this agreement, you understand that all movement will be tracked and stored as an official record . . ." [doc. #26-2, p. 2].  Additionally, the agreement states:

". . .you understand that all information related to your location while in the monitoring program is property of EM Systems and any Sheriff's Department, judicial agency, law enforcement agency, or any other entity involved in the ordering or enforcement of your electronic monitoring program." *Id.*

An investigation of Mitchell was initiated because he was suspected of being a "major drug distributor in the Ouachita parish area." (Opp. to M/Suppress [doc. #26, p. 3]). Officers and agents obtained Mitchell's criminal history, conducted physical surveillance of him, developed information on his patterns and routines, and ultimately facilitated two controlled buys of methamphetamine and fentanyl from him in April of 2024. *Id.* at pp. 3-4. That same month, April 2024, investigating agents obtained access to the geolocation data generated by Mitchell's GPS ankle monitor to verify observations made from physical surveillance and controlled buys and information from confidential sources. *Id.* at p. 5.

Agents observed Mitchell leaving his residence early in the day and returning late in the evening. *Id.* at p. 4. Mitchell's whereabouts were confirmed by him during calls to confidential informants, physical surveillance by law enforcement, and social media updates by Mitchell. *Id.* Meanwhile, the GPS ankle monitor was used to verify the information collected. *Id.* at p. 5. During this time, Mitchell traveled to Houston, Texas, and back. Once back, he would contact a confidential source and arrange a controlled buy. *Id.* at p. 4.

On May 2, 2024, officers obtained a search warrant for Mitchell's residence located in Monroe, Louisiana. *Id.* at p. 5. An application for the search warrant was submitted to a state district court judge and was signed the same evening. *Id.* at pp. 5-6. The affidavit alleged that officers had investigated Mitchell over the course of a year and received reliable information that he sold large amounts of methamphetamine and fentanyl. *Id.* at p. 6. Specifically, the affidavit

discussed the two controlled buys that had occurred.  *Id.*  It also notes that during these purchases, officers "electronically surveyed Mitchell via his ankle monitor."  *Id.*

The affidavit for the search warrant states that "[d]uring this investigation with the help of electronic surveillance your Affiant was able to confirm that Mitchell does in fact make frequent trips to Houston TX from Monroe La."  [doc. #26-3, p. 4].  Further, it states that "[i]t should also be noted that due to the limited number of Narcotic agents conducting surveillance your Affiant electronically surveyed Mitchell via his ankle monitor."  *Id.*  Electronic surveillance was used to corroborate Mitchell's location on April 25, 2024.  *Id.*  Mitchell's GPS ankle monitor was again used on May 2, 2024, to locate Mitchell as he was travelling on Interstate 20 from Houston to Monroe.  *Id.* at pp. 4-5.

The search warrant of Mitchell's residence was executed, and officers found multiple bags containing drug paraphernalia and containing various amounts of drugs, including 58 grams of methamphetamine, 40 grams of marijuana, 23 grams of crack cocaine, 57 grams of powder cocaine, 2,000 fentanyl pills, 531 hydrocodone pills, 150 ecstasy pills, and 14 unopened bottles of promethazine.  (Opp. to M/Suppress [doc. #26, pp. 6-7]).

Mitchell was arrested on May 2, 2024.  *Id.* at p. 4.  Subsequent to Mitchell's arrest, he provided a post-*Miranda* statement to law enforcement and unlocked his cell phone and consented to share information.  *Id.* at p. 7.  Mitchell provided information regarding his source of supply in Houston, Texas, and he also shared pictures and text messages between him and those involved in narcotic transactions.  *Id.*  After the interview, officers applied for a search warrant for Mitchell's phone, and that application did not rely on the use of the GPS ankle monitor location information.  *Id.* at pp. 7-8.

Mitchell is charged with (1) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); (2) possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi); and (3) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).

On November 27, 2024, Mitchell filed a Motion to Suppress. [doc. #19]. Mitchell argues that the Government violated his Fourth Amendment rights by utilizing the GPS ankle monitor location services without a search warrant. (Memo in Support of M/Suppress [doc. 19-2, p. 4]). He further contends that no exception to the warrant requirement applies. *Id.* Mitchell never consented to have *all* his movements monitored. *Id.* The state court order for the GPS ankle monitor did not require constant monitoring, but rather was programmed to send an alert to law enforcement if Mitchell was located within 1,000 feet of the victim's residence. *Id.* Since law enforcement directly contacted the monitoring company to obtain Mitchell's GPS information without a warrant, his constitutional right was violated. *Id.* Accordingly, Mitchell requests that all evidence in this case should be excluded, including but not limited to, any drugs, paraphernalia, videos, weapons, or statements from any controlled buys, the arrest of Mitchell, or from the search of his car, phone, and apartment. *Id.* at pp. 4-5.

On January 10, 2025, the Government filed an opposition to Mitchell's motion. [doc. #26]. Therein, the Government argues that there are two inquiries to determine if law enforcement's monitoring of the GPS ankle monitor location data is constitutional. *Id.* at p. 9. The first inquiry asks if the Government has engaged in a trespass offense against either the person or his property, and, if so, whether there a valid warrant. *Id.* The Government answers this first inquiry in the negative. *Id.* It argues that Mitchell consensually allowed law enforcement to access and electronically monitor his location when he agreed to have the GPS ankle monitor installed. *Id.*

This case is distinguishable from *United States v. Jones*, 565 U.S. 400 (2012), as Mitchell consensually placed the GPS ankle monitor on himself, while in *Jones*, law enforcement placed a GPS monitoring device on the defendant's vehicle without the defendant's knowledge. *Id.* at p. 10.

Additionally, the Government argues that Mitchell has no reasonable expectation of privacy in location data that he has agreed to share in "exchange for pre-trial release on bond," as the Supreme Court has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. *Id.* at p. 11. Here, Mitchell clearly authorized the use of the information when he signed the GPS monitoring agreement. *Id.* Further, the GPS ankle monitor "revealed nothing that the officers did not already know." *Id.* at p. 12. Officers had firsthand knowledge of the controlled buys. *Id.*

The Government also argues that this situation falls into the plain view exception for the warrant requirement. *Id.* "There is no rule that requires law enforcement to avert their eyes to defendant's movements obtained from the GPS location data when a court has authorized law enforcement to collect this data and review it." *Id.* As the officers had a right to be in the place to see the GPS monitoring system, and the incriminating character was immediately apparent, the exception should apply. *Id.* at pp. 12-13.

In the alternative, the Government contends that the good-faith exception to the exclusionary rule should apply. *Id.* at p. 14. Even if the Court finds that the GPS information should not have been used, the remedy is not to throw out the warrant or suppress its fruit. *Id.* at p. 15. Rather, the Court should excise that information and then re-evaluate to see if the remaining facts support a finding of probable cause. *Id.* Here, there was enough additional information excluding the GPS ankle monitor that supports a finding of probable cause. *Id.* at p. 16.

A hearing on the Motion to Suppress was held on January 29, 2025, where the Court heard testimony from the Government and defense witnesses and received evidence. Mitchell and the Government were permitted to file Post-Hearing Briefs. On April 4, 2025, Mitchell filed his Post-Hearing Brief. [doc. #36]. Mitchell maintains that a warrant was required in this case as the use of a GPS is considered an invasion of privacy. *Id.* at p. 2. Detective Cowan accessed the data from Mitchell's ankle monitor to determine his past and present location, which far exceeded the scope of the court order and associated EM Systems agreement. *Id.* at p. 5. Mitchell chose only for EMS to monitor him, not law enforcement. *Id.* at p. 6. Since Mitchell never entered into the exclusion zone, he possessed a subjective expectation of privacy. *Id.* Further, this data possessed the capability of "revealing intimate, private details" about Mitchell's life. *Id.*

Mitchell also argues that Detective Anthony Cowan used the ankle monitor data to catch him committing a crime, which is typically considered an unreasonable search. *Id.* at pp. 6-7. Detective Cowan's attempt to minimize his usage of the GPS ankle monitor falls flat because his argument that a license plate reader is more accurate than a GPS ankle monitor contradicts the testimony of the owner of EM Systems who stated the GPS ankle monitor provides a person's exact location. *Id.* Detective Cowan's testimony was contradictory to his own report as he testified that he only went back on the monitor that day to see Mitchell's movements, but his report states that when he conducted surveillance on Mitchell's residence, he also used the data from the GPS ankle monitor. *Id.* at pp. 7-8. Additionally, officers electronically surveyed Mitchell via his GPS ankle monitor during one of the controlled purchases. *Id.* at p. 8.

By law enforcement using this data to stop and search Mitchell, the Government conducted an illegal search, and "all resulting fruits should be suppressed under the exclusionary rule." *Id.* at p. 9. This unsupervised and unregulated access of GPS data requires "a just punishment to

dissuade any further abuse." *Id.* Mitchell urges the Court to suppress the narcotics, his statement, and his cell phone data. *Id.*

On April 4, 2025, the Government filed its Post-Hearing Brief. [doc. #37]. The Government contends that the testimony and evidence presented at the hearing confirmed that "there was probable cause to arrest [Mitchell] based solely on the investigation of the officers and independent of GPS location data." *Id.* at p. 1. Alternatively, officers lawfully used the GPS location information to corroborate information. *Id.* Throughout the seven-months long investigation, agents utilized confidential informants, audio and video surveillance, and controlled purchases. *Id.* at p. 2. Investigators learned the location of Mitchell's residence through physical surveillance. *Id.* Through information provided by a confidential source, controlled purchases, and license plate tags, officers determined that Mitchell used two vehicles while distributing drugs. *Id.* It was not until after the second controlled purchase that Detective Cowan learned Mitchell had a GPS tracking device. *Id.* at p. 3.

The Government argues that Mitchell's contention that law enforcement illegally obtained and used the GPS ankle monitor to continually track and monitor him is false. *Id.* at p. 4. Mitchell's GPS ankle monitor was not law enforcement's primary source of information. *Id.* at p. 5. The Government asks that the Court deny the motion to suppress. *Id.* at p. 6.

On April 17, 2025, Mitchell filed a reply to the Government's Post-Hearing Brief. [doc. #38]. Mitchell argues that the Government relies solely on Detective Cowan's testimony, but his testimony consisted of "contradictions which call into question his credibility." *Id.* at pp. 1-2. Two of the "incredulous" claims include that the GPS ankle monitor does not provide real-time data and that a license plate reader is more accurate than a GPS ankle monitor. *Id.* at p. 2. Further, the lack of oversight and the vague reference to electronic surveillance in Detective Cowan's report

support a finding that he used the GPS ankle monitor more frequently than he admitted. *Id.* The exclusionary rule applies in this case, and, since Detective Cowan did not obtain a warrant, all fruits of the search resulting from this taint should be suppressed. *Id.* at p. 3.

On April 17, 2025, the Government filed a reply to Mitchell's Post-Hearing Brief. [doc. #39]. The Government maintains that Mitchell has no expectation of privacy in GPS location information that he consensually provides to a monitoring company and to law enforcement. *Id.* at p. 1. This case is distinguishable from *Katz v. United States*, 389 U.S. 347 (1967), as Mitchell consented to the GPS ankle monitor and was advised that all movement would be tracked. *Id.* at p. 2. Additionally, the exclusionary rule does not apply because the evidence was seized from controlled purchases from Mitchell as well as from searches incident to his arrest. *Id.* at p. 3. "All evidence seized in this case[] was obtained legally." *Id.*

## Relevant Testimony and Documentary Evidence

During the hearing, the Government called two witnesses, Detective Anthony Cowan and Shelby Cage. The defense called one witness, Kevin Johnson. Multiple exhibits were introduced and admitted into evidence. Mitchell introduced and the Court admitted the arrest warrant, search warrant, and cell phone warrant into evidence, as well as state court orders from 2022 and 2024. (Tr. 77). The Government introduced, and the Court admitted Exhibit 2, the 2024 agreement between Mitchell and Electronic Monitoring Systems, and Exhibit 5, the 2022 Electronic Monitoring Systems agreement. (Tr. 101, 114).

The Court summarizes the relevant testimony and evidence as follows:

The Government's first witness was Detective Anthony Cowan ("Detective Cowan") of the Monroe Police Department ("MPD"). (Hearing Transcript [doc. #33, pp. 4-5]) (hereinafter

abbreviated as "Tr." followed by the page number).  Detective Cowan has served with MPD for approximately nine years and is currently assigned to the Metro Narcotics Unit, where he investigates the flow of narcotics and identifies suppliers within Ouachita Parish.  (Tr. 5).  He has extensive annual training and has participated in hundreds of narcotics investigations.  (Tr. 6).

Detective Cowan's investigation into Mitchell began on November 28, 2023, after receiving information from a confidential source alleging that Mitchell was a local drug supplier.  (Tr. 8).  Over the course of the six-to-seven-month investigation that ended in May of 2024, Detective Cowan conducted surveillance, reviewed reports, tracked vehicles, and worked with confidential sources.  (Tr. 8, 32-33).  Using controlled purchases, physical surveillance, and information from a confidential source, Detective Cowan identified Mitchell's residence.  (Tr. 10).  He was able to ascertain Mitchell's residence prior to learning of the ankle monitor.  (Tr. 11).

Detective Cowan was also able to determine the vehicles Mitchell drove prior to learning of the ankle monitor.  (Tr. 11).  The first controlled purchase began when the confidential source advised Detective Cowan that Mitchell was driving a silver four-door Hyundai vehicle.  (Tr. 11).  It was also confirmed that Mitchell drove a red Hyundai.  (Tr. 12).  A Louisiana temporary tag was used on both vehicles.  (Tr. 12).  The temporary tag was assigned to the red Hyundai, but when Detective Cowan ran the tag, it "came back" to no one.  (Tr. 13).  Detective Cowan was able to determine that the red Hyundai was registered to a Larry Mitchell, Sr.  (Tr. 13).  The Defendant Mitchell is a junior.  (Tr. 13).  The temporary tag for the red Hyundai was also observed on the silver Hyundai.  (Tr. 12-13).

Two confidential sources indicated that Mitchell's supplier was in Houston, Texas.  (Tr. 14).  The first controlled purchase occurred on April 2, 2024, at a local gas station.  (Tr. 15).  Law enforcement was able to purchase twenty fentanyl pills for two-hundred dollars from Mitchell

through a confidential source.  (Tr. 15).  Officers, including Detective Cowan, were parked directly next to the service station conducting surveillance.  (Tr. 16).  The hand-to-hand transaction between Mitchell and the confidential source was observed by law enforcement.  (Tr. 16).  The first controlled purchase occurred before Detective Cowan knew of the ankle monitor.  (Tr. 16-17).

The second controlled purchase occurred on April 25, 2024, at a Johnny's Pizza in Ouachita Parish.  (Tr. 17).  Law enforcement was able to purchase ninety-six grams of methamphetamine for a price of six-hundred dollars from Mitchell through a confidential source.  (Tr. 17).  The restaurant was only a block from Mitchell's residence.  (Tr. 17).  Detective Cowan was able to determine Mitchell's phone number through a confidential source, as this is how he communicated with the confidential sources.  (Tr. 18).

Detective Cowan first learned of the ankle monitor on April 25, 2024, from Agent Tyler Dooley, who saw Mitchell's information on a shared monitoring website.  (Tr. 9, 19).  Detective Cowan has a log-in for the website, which is shared with others, and he is able to view anyone in Ouachita Parish who is assigned to this particular company's ankle monitors.  (Tr. 19, 46).  All law enforcement agencies in the Ouachita Parish area, including MPD, have access to this monitoring site.  (Tr. 44).  Once accessed, law enforcement can see every location a person has visited while wearing the ankle monitor.  (Tr. 49).  Detective Cowan used the ankle monitoring data to corroborate information he had already obtained.  (Tr. 20, 48).  In his report for April 25, 2024, Detective Cowan stated "[i]t should be noted that due to the limited number of narcotic agents . . . conducted surveillance will be electronically monitored to Mitchell being on his ankle monitor." (Tr. 39-40).

Detective Cowan did not obtain a search warrant or Mitchell's consent to access the GPS ankle monitoring data.  (Tr. 51, 84).  He testified that he believed Mitchell did not have an

expectation of privacy because Mitchell had signed an agreement and was aware of the "legalities" of wearing the ankle monitor. (Tr. 52). Mitchell had twice been court ordered to wear an ankle monitor. (Tr. 53). In 2022, the monitor was in place on an attempted murder charge. (Tr. 53). In Detective Cowan's arrest affidavit, he referred to the 2022 court order, not the 2024 court order for domestic abuse battery charge. (Tr. 54, 55). The 2024 court order provides that Mitchell was to be monitored by Innovative Monitoring Network. (Tr. 60). There is no mention that the Ouachita Parish Sheriff's Department or Metro Narcotics would be involved in his monitoring. (Tr. 60). However, the affidavit did note that Mitchell had multiple open cases. (Tr. 56).

On May 2, 2024, Detective Cowan received information from a confidential source that Mitchell was headed out of town to pick up narcotics. (Tr. 20, 21). A second confidential source came into Detective Cowan's office and informed him that Mitchell was headed to Houston. (Tr. 20). Mitchell posted to Facebook that day a video of a large amount of cash on a red vehicle and a video of himself driving on the highway. (Tr. 22). Detective Cowan also was able to confirm that Mitchell was in his red vehicle by using a license plate reader data. (Tr. 23). Based on the two prior controlled buys, Detective Cowan obtained an arrest warrant for Mitchell. (Tr. 20). The plan was to arrest Mitchell when he returned to Ouachita Parish. (Tr. 20-21). The temporary tag that had been on the silver Hyundai was switched to the red Hyundai on May 1. (Tr. 38).

Detective Cowan and Sergeant Mahoney were located just east of Minden when they located Mitchell, with the help of a license plate reader, returning from Houston. (Tr. 24). Detective Cowan also used Mitchell's GPS ankle monitor data to confirm his location. (Tr. 24, 63, 66). Detective Cowan explained that the GPS data was not real time, and the license plate reader, which is 100% accurate, helped determine the exact vehicle Mitchell was in. (Tr. 66). The Ouachita Parish Special Crimes Apprehension Team ("SCAT") observed Mitchell conduct a traffic

violation. (Tr. 25).   SCAT officers then conducted a traffic stop on Mitchell once he entered into Ouachita Parish. (Tr. 25). Mitchell slowed down and began to pull over to the shoulder as if he was going to stop, but he then immediately sped off. (Tr. 25). He led officers on a fifteen-mile pursuit. (Tr. 26).

Eventually, Mitchell's vehicle came to a stop, and he exited the vehicle holding a large gift bag. (Tr. 27). He threw the bag and began to run. (Tr. 27). A K9 unit on scene apprehended him shortly thereafter. (Tr. 27). After Mitchell was taken into custody, officers recovered three kilograms of methamphetamine from the gift bag. (Tr. 27). An unidentified female passenger was also in the vehicle and was taken into custody. (Tr. 27-28). Following their arrests, Detective Cowan obtained and executed a search warrant for Mitchell's residence. (Tr. 28).

After Mitchell was apprehended, he was taken to the hospital for treatment. (Tr. 30). After treatment, Mitchell was transported to Metro Narcotics where he was Mirandized, and then questioned. (Tr. 30). Mitchell admitted that he traveled to Houston to acquire narcotics. (Tr. 30). Mitchell voluntarily unlocked his phone and showed Detective Cowan contact information, social media posts, and text messages that corroborated everything Detective Cowan "had learned from the beginning." (Tr. 31). This concluded Detective Cowan's investigation. (Tr. 31). At no time during the time period of November 28, 2023, to May 2, 2024, did Mitchell enter into the exclusion zone. (Tr. 61-62).

The Government then called its next witness, Shelby Cage ("Cage"). (Tr. 88). Cage has been the owner of Electronic Monitoring Systems ("EM Systems") for four years. (Tr. 88). The company authorizes law enforcement to use its data and software. (Tr. 89). Each agency has its own log-in. (Tr. 90). When a person elects to wear an ankle monitor through EM Systems, they

are advised by Cage or one of his employees that they are being monitored, and this information is shared with law enforcement. (Tr. 104, 112).

When the device is set for an exclusion zone, a geofence is programmed around the area. (Tr. 94). Once a person steps into the exclusion zone, EM Systems contacts the agency that has jurisdiction depending on the address. (Tr. 95). The location can be viewed in real time. (Tr. 97).

EM Systems monitored Mitchell from December 22, 2022, until April 26, 2023, and then again on January 26, 2024, until May 3, 2024. (Tr. 98). Mitchell was required to sign paperwork both times before installation of the ankle monitor. (Tr. 99). Mitchell signed an agreement with EM Systems, which has been marked as Exhibit 2. (Tr. 101). In that agreement, paragraph fourteen provided that individuals would be monitored by law enforcement, EM Systems, and any other people involved in the enforcement of the electronic monitoring. (Tr. 114). It does not state that law enforcement can login at any time to investigate a person's past and current location. (Tr. 117). Mitchell was informed by Cage that his movements would be monitored. (Tr. 104).

Defense called its first and only witness, Kevin Johnson ("Johnson"). (Tr. 131). Johnson is a practicing attorney. (Tr. 132). He is a public defender with the Fourth and Fifth Judicial District Courts. (Tr. 132). Johnson currently represents Mitchell on his state charges. (Tr. 133). Johnson has never known of law enforcement being involved with the monitoring. (Tr. 138). He was shocked to find out that law enforcement had access to the GPS ankle monitor data 24/7. (Tr. 139).

## Law & Analysis

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend.

IV.    The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted). "The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citation and quotation marks omitted).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "'cannot be used in a criminal proceeding against the victim of the illegal search or seizure.'" *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

*(a) Reasonable Expectation of Privacy*

Before the Court is an issue not yet addressed by the Fifth Circuit: whether law enforcement's viewing of the location information provided by Mitchell's GPS ankle monitor is a search under the Fourth Amendment. "A Fourth Amendment privacy interest is infringed when the government physically intrudes on a constitutionally protected area or when the government violates a person's 'reasonable expectation of privacy.'" *United States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016) (quoting *United States v. Jones*, 565 U.S. 400, 406 (2012)).

To assess whether a "reasonable expectation of privacy" exists, the Supreme Court has applied Justice Harlan's twofold approach as explained in his concurrence in *Katz v. United States*,

389 U.S. 347.  *United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024). Specifically, for Fourth Amendment protections to attach to a person's privacy interest, the person, first, must "have exhibited an actual (subjective) expectation of privacy."  *Katz*, 389 U.S. at 361. Second, that expectation must "be one that society is prepared to recognize as 'reasonable.'"  *Id.*

"Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, however, his or her expectations of privacy . . . are reduced." *Maryland v. King*, 569 U.S. 435, 463 (2013); *see also Haskell v. Brown*, 677 F. Supp. 2d 1187, 1197 (N.D. Cal. 2009) ("While arrestees certainly have a greater privacy interest than prisoners, it is this Court's view that they also have a lesser privacy interest than the general population."). However, "[t]he fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely."  *Riley v. California*, 573 U.S. 373, 392 (2014).

The Court finds that Mitchell did not have a reasonable expectation of privacy in the data collected from his GPS ankle monitor.  According to the state court's "Order for GPS Monitor," Mitchell was charged with (1) false imprisonment; (2) violation of protective order; (3) resisting an officer; (4) interfering with emergency communication; (5) domestic abuse battery; and (6) aggravated battery.  [doc. #19-4].  As a condition of his release, Mitchell was required to post a cash or surety bond.  *Id.*  The state court also imposed a geographic restriction, prohibiting him from coming within 1,000 feet of the alleged victim's residence.  *Id.*  Given the nature of these charges, law enforcement had probable cause to believe Mitchell had committed dangerous offenses that may warrant pretrial detention.  Accordingly, Mitchell qualifies as an arrestee with a diminished expectation of privacy under established precedent.

Moreover, Mitchell expressly waived any expectation of privacy in his movements.  As a condition of his release, Mitchell signed an agreement with EM Systems indicating his knowledge

of and consent to the following provision: "[i]f you are being monitored by a GPS device as part of this agreement, you understand that *all* movement will be tracked and stored as an official record . . ." [doc. #26-2, p. 2] (emphasis added). Mitchell further agreed that he understood "all information related to [his] location while in the monitoring program is property of EM Systems and any Sherriff's Department, judicial agency, law enforcement agency, or any other entity involved in the ordering or enforcement of [his] electronic monitoring program." *Id.* By signing this agreement, Mitchell expressly acknowledged his understanding that he would be subject to continuous location tracking and that the resulting data would be available to law enforcement.

Although the primary purpose of the monitoring program was to enforce the exclusion zone, the language of the agreement made clear that *all* movements would be tracked and recorded and that law enforcement had access to this data regardless of whether a violation occurred. Mitchell voluntarily accepted these terms in exchange for his pretrial release, and the monitoring conditions were integral to that release. Therefore, the Government's use of data from the GPS ankle monitor did not violate any expectation of privacy that society would recognize as reasonable.

The cases Mitchell cites in support of his motion do not undermine that determination, as each is clearly distinguishable from the facts before the Court. In *United States v. Jones*, law enforcement installed a GPS tracking device on the undercarriage of the defendant's car without his knowledge or consent. 565 U.S. at 403. The Supreme Court held that this act constituted a search under the Fourth Amendment because it violated the defendant's reasonable expectation of privacy. *Id.* at 404. Similarly, in *Grady v. North Carolina*, the Supreme Court concluded that attaching a tracking device to a person's body *without consent* constitutes a search. 575 U.S. 306, 309 (2015) (emphasis added). In contrast, Mitchell voluntarily consented to wearing the GPS

16

ankle monitor as a condition of his release.  Testimony from Cage confirmed that individuals monitored through EM Systems are explicitly informed that their movements will be tracked and shared with law enforcement.  (Tr. 104).  Mitchell was made aware both by the agreement he signed and by EM Systems personnel that all movement data would be recorded and accessible to authorities.  He knowingly agreed to this monitoring in exchange for pretrial release.  Accordingly, the Court finds these cases inapplicable and unpersuasive.

Mitchell also points specifically to the Fifth Circuit's decision in *United States v. Smith* as addressing a similar issue to the one in this case.  110 F.4th 817.  There, law enforcement obtained a geofence warrant to determine the identities of possible suspects of a robbery.  *Id.* at 821.  "In requesting a geofence warrant, [l]aw enforcement simply specifies a location and period of time, and, after judicial approval, companies conduct sweeping searches of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe."  *Id.* at 822.  The Fifth Circuit found that a geofence warrant constitutes a search.  *Id.* at 835.  While users do opt in to having their location history monitored, the process to opt out is "hardly informed . . . [and] may not even be voluntary."  *Id.*  The fact that 592 million people have "opted in" to comprehensive tracking of their locations made the Fifth Circuit question how voluntary this process truly is.  *Id.* at 836.  The court was concerned with how "sweeping, granular, and comprehensive" location history appears to be when it comes to collecting and storing location data.  *Id.* at 823.

This case, however, is clearly distinguishable from Mitchell's circumstances.  In *Smith*, the court scrutinized the broad and largely involuntary collection of private location data from hundreds of millions of users who did not affirmatively agree to individualized surveillance.  By contrast, Mitchell expressly agreed to wear a GPS ankle monitor as a condition of his pretrial

release.  Unlike the millions of individuals in *Smith*, most of whom likely had little-to-no understanding of what a geofence was or how their location data was being used, Mitchell knowingly and voluntarily submitted to targeted monitoring as part of a judicially-imposed release order.  The conditions in the agreement were not buried in fine print or hidden behind difficult settings; rather, he made the clear and deliberate choice to accept the express terms in order to secure his release.  As such, the Court finds that *Smith* is also inapplicable to the facts of this case.

Accordingly, the Court finds that law enforcement's use of the data from the GPS ankle monitor was not a search as Mitchell did not have a reasonable expectation of privacy that society is prepared to recognize.  Therefore, a warrant was not required to access the location data.  **IT IS RECOMMENDED** that the Motion to Suppress be **DENIED**.

### (b) Consent Exception to Warrant Requirement

Even if the Court were to find that law enforcement's use of Mitchell's GPS ankle monitor constituted a search, it would still fall within the consent exception to the Fourth Amendment's warrant requirement.

It is well-established that "consent" is an exception to the Fourth Amendment's requirement of a warrant.  *Georgia v. Randolph*, 547 U.S. 103, 109 (2006).  In other words, a person who has "consented to a search" no longer holds a "reasonable expectation of privacy" in the area searched.  *United States v. Ibarra*, 948 F.2d 903, 907 (5th Cir. 1991). "'The voluntariness of consent is a question of fact to be determined from a totality of the circumstances.'"  *United States v. Soriano*, 976 F.3d 450, 455 (5th Cir. 2020) (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005)).  To evaluate the voluntariness of consent, courts consider six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police

procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.* (citing *Santiago*, 976 F.3d at 455). "Because this Court finds that [Defendant] consented to electronic monitoring, any Fourth Amendment search prompted by the use of the electronic monitoring device was constitutionally valid." *Berthier v. People*, 2024 WL 4994024, at *8 (V.I., 2014) (case involving twenty-four-hour house arrest with electronic monitoring pending trial).

Here, Mitchell voluntarily agreed to wear the GPS ankle monitor as a condition of his pretrial release. Notably, this was not his first time to be subjected to electronic monitoring by this company. (Tr. 98). Court records reflect that Mitchell was previously ordered to wear an ankle monitor in 2022, making him familiar with the nature and scope of such surveillance. (Tr. 98). In this case, Mitchell again signed an agreement with EM Systems, which expressly stated that all movements would be tracked, recorded, and accessible to law enforcement. (Tr. 101). Cage or his employees further explained the terms of monitoring during installation of the device. (Tr. 104, 112). When faced with the option to remain in custody or secure his release, Mitchell opted for pretrial release and paid for the GPS ankle monitor himself. There is no evidence of coercion or confusion.

Accordingly, if the Court had found that a warrantless search occurred, the consent exception to the warrant requirement would apply.

### (c) Good Faith Exception to Exclusionary Rule

The Government contends that, even if the use of the GPS ankle monitor data was an unconstitutional search, the good-faith exception to the exclusionary rule applies. The Court

agrees and finds that the good-faith exception would also apply if it had determined the use of the GPS ankle monitor data was an unconstitutional search.

The exclusionary rule requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted). A motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process. *United States v. Sibley*, 448 F.3d 754, 757-58 (5th Cir. 2006) (citation omitted). First, the court must decide whether the good-faith exception to the exclusionary rule applies. *Id.* "The good-faith exception provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded." *Id.* (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002)) (internal quotation marks omitted). Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). If this good-faith exception applies, then the inquiry ends. *Id.* The Fifth Circuit has recognized that warrants that rely on unlawfully obtained evidence implicate the "good-faith exception." *United States v. Turner*, 125 F.4th 693, 713 (5th Cir. 2025).

When an officer obtains evidence in an "objectively reasonable good-faith reliance" on a search warrant, the exclusionary rule's "deterrence rationale loses much of its force," and the evidence is admissible. *Pope*, 467 F.3d at 916. As the Fifth Circuit explained,

> [t]his is in part because an issuing-judge's probable cause determination, based on an underlying affidavit, is afforded great deference. Of course, such deference is not boundless, but, where the officer's conduct is objectively reasonable, excluding

20

> the evidence will not further the ends of the exclusionary rule in any appreciable way. Thus, when an officer acting with objective good faith has obtained a search warrant from a judge . . . and acted within its scope, the officer cannot be expected to question the magistrate's probable cause determination . . .

*Gibbs*, 421 F.3d at 357-58 (internal citations and quotation marks omitted).

In short, "[f]or the good-faith exception to apply, the executing-officer's reliance on the issuing-judge's probable-cause determination and the technical sufficiency of the warrant must have been objectively reasonable." *Id.* at 358. (citation omitted). The good faith inquiry "'is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Maggitt*, 778 F.2d 1029, 1035 (5th Cir. 1985) (quoting *United States v. Leon*, 468 U.S. 897, n.23 (1984)). Stated another way, "if it is plainly evident that a magistrate or judge had no business issuing a warrant, then police cannot objectively rely on the warrant." *Id.* (quoted source and internal quotation marks omitted).

Importantly, the good-faith exception asks "not whether the issuing judge made a proper determination of probable cause, but whether the agents reasonably relied on the judge's determination in light of the information set forth in the affidavit." *United States v. Pigrum*, 922 F.2d 249, 252-253 (5th Cir. 1991) (citations omitted). Ultimately, a reviewing court will defer to an issuing judge's probable cause determination in signing a warrant unless:

 (1) the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

 (2) the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant;

 (3) the underlying affidavit is "bare bones" (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or

> (4)    the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Gibbs,* 421 F.3d at 358 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)) (internal quotation marks omitted).

The Government bears the burden of demonstrating that the good-faith exception is applicable. *United States v. Gant*, 759 F.2d 484, 487-488 (5th Cir. 1985).

Mitchell seeks the suppression of all evidence in this case, including, but not limited to, any drugs, paraphernalia, videos, weapons, and statements from any controlled buys; his arrest; and evidence from the search of his car, phone, and apartment. (Memo in Support of M/Suppress [doc. 19-2, pp. 4-5]).

First, some evidence Mitchell seeks to exclude is not subject to the exclusionary rule or the good-faith exception. The first controlled purchase occurred on April 2, 2024, before law enforcement was even aware that Mitchell was wearing a GPS ankle monitor. (Tr. 17). This controlled purchase was based entirely on information from confidential sources, record searches, and physical surveillance by law enforcement. Because the GPS ankle monitor data played no role in the April 2nd transaction, it does not implicate the exclusionary rule or the good-faith exception in any way. As for the second controlled purchase on April 25, 2024, Detective Cowan testified that it was similarly based on information from confidential sources, physical surveillance, and vehicle tracking. Although he also reviewed Mitchell's GPS ankle monitor data, he explained that it was used only to corroborate information already gathered through traditional investigative methods. (Tr. 20, 48). Because the second controlled purchase was not conducted pursuant to a warrant and was supported by independent sources of information, including confidential sources, physical surveillance, and vehicle tracking, the exclusionary rule or the good-

faith exception are not implicated. Detective Cowan's minimal reference to the GPS ankle monitor was merely corroborative. Accordingly, both controlled purchases were constitutional and do not implicate the exclusionary rule. Even if the use of GPS ankle monitor data were deemed an unconstitutional search, evidence derived from the two controlled purchases should not be excluded.

On May 2, 2024, Detective Cowan obtained an arrest warrant for Mitchell. (Tr. 20). The basis for the arrest warrant was the two controlled purchases.[1] (Tr. 20). After observing Mitchell commit a traffic violation, SCAT officers initiated a traffic stop. (Tr. 25). By the end of the traffic stop, Mitchell was taken into custody, and a subsequent search of his gift bag revealed drug paraphernalia. (Tr. 27). Although the affidavit in support of the arrest warrant included the information that Michell had a GPS ankle monitor, it did not suggest that probable cause was based on the GPS ankle monitor's data. Instead, the affidavit clearly relied on the two controlled purchases. As discussed above, the first controlled purchase was conducted without any use of the GPS ankle monitor, and the second used the data to corroborate the information that was already known.

It was objectively reasonable for law enforcement to rely on the arrest warrant because it was supported by evidence independent of the GPS data. The issuing judge made a probable cause determination based on the facts in the affidavit, and the officers reasonably relied on that

---

[1] The Court notes that, during the hearing, it was pointed out that Detective Cowan stated in the arrest affidavit that Mitchell was on an "[a]nkle [m]onitor due to an active attempted murder case." [doc. #19-5, p. 4]. Mitchell's current ankle monitor was ordered in connection with a domestic abuse battery charge, not an attempted murder charge. While this statement in the affidavit was inaccurate, it does not invalidate the arrest warrant. Mitchell was in fact wearing an ankle monitor, and there is no indication that the judge relied solely or primarily on this misstatement in making the probable cause determination. The affidavit also included detailed information about the controlled purchases and other investigative efforts that supported probable cause for arrest.

determination. Accordingly, even if the use of the GPS ankle monitor constituted an unconstitutional search, the arrest warrant was based on separate, untainted evidence, and the officers executed the warrant in good faith.

Detective Cowan then obtained and executed a search warrant for Mitchell's residence that same night. (Tr. 28). The search warrant was supported by multiple sources of information, including statements from confidential sources, the two controlled purchases, Mitchell's flight from officers, his arrest, and the GPS ankle monitor data. [doc. #19-9]. While the GPS ankle monitor data was included in the affidavit, it was not the only basis for probable cause. The affidavit reflected a range of independent investigative efforts and corroborated facts, and there is no indication that the judge was misled or that the affidavit contained information that the affiant knew was false or presented with reckless disregard for the truth. The judge acted with his discernment in issuing the warrant, and law enforcement reasonably relied on that determination in good faith. Accordingly, even if the use of the GPS ankle monitor constituted an unconstitutional search, the arrest warrant was based on separate, untainted evidence, and the officers executed the warrant in good faith.[2]

After his arrest and being advised of his *Miranda r*ights, Mitchell voluntarily unlocked his cell phone during his interview with Detective Cowan and showed him contact information, social media posts, and text messages. (Tr. 31). The following day, Detective Cowan obtained a search warrant for Mitchell's cell phone. [doc. #19-8]. The warrant application was supported by extensive evidence, including confidential source statements, the two controlled purchases,

---

[2] A search warrant is not rendered invalid if, putting aside the unconstitutional portions of a search warrant, the remaining information is sufficient to establish probable cause. *United States v. Karo,* 468 U.S. 705, 719 (1984) (citing *Franks v. Delaware*, 438 U.S. 154, 172 (1978)).

Mitchell's flight from officers, his arrest, and the post-*Miranda* statements Mitchell made during the interview. *Id.* at pp. 2-3. At this point, Detective Cowan had compiled ample corroborated evidence to support probable cause. As with the prior warrants, law enforcement reasonably relied on the judge's determination, and none of the limited exceptions to the good-faith doctrine apply.

In conclusion, the Court finds that the use of Mitchell's GPS ankle monitor did not constitute a search. Even if it did, and even if that search were unconstitutional, the good-faith exception would apply to all the evidence Mitchell seeks to exclude.[3] Each warrant was supported by independent and corroborated evidence beyond the GPS ankle monitor data, and law

---

[3] The exclusionary rule prohibits "the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 537 (1988) (citations omitted). However, as the exclusionary rule was being developed by the Supreme Court, it also announced the "independent source" doctrine. *Id.* The Supreme Court has described the doctrine this way:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Id.* (citing *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

Mitchell also argues that the fruit of the poisonous tree doctrine applies to this case. However, even if this Court were to find that use of the GPS ankle monitor data constituted an unconstitutional search, that alone would not warrant exclusion of all the evidence Mitchell seeks to suppress. Detective Cowan testified that the investigation had begun in November of 2023. Before obtaining the GPS ankle monitor data, law enforcement had already spoken with two confidential sources, orchestrated controlled purchases, conducted physical surveillance, and used license plate readers to investigate Mitchell. Because the evidence was obtained through multiple independent sources, the fruit of the poisonous tree doctrine would not apply.

enforcement acted in objectively reasonable reliance on the judicial determinations of probable cause.

### Conclusion

For the above stated reasons,

**IT IS RECOMMENDED** that the Motion to Suppress [doc. #19] filed by Defendant Larry Mitchell be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for an extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 28th day of May, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE